UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **HUGO GONZALEZ** | **CASE NO. 2:19-CV-00130 LEAD** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **SEA FOX BOAT CO INC** | **MAGISTRATE JUDGE KAY** |

### MEMORANDUM RULING

Before the Court is "Defendant, Yamaha Motor Corporation, U.S.A.'s Motion for Partial Summary Judgment on Plaintiffs' Claims for Punitive Damages" (Doc. 165). Yamaha Motor Corporation, U.S.A. ("Yamaha") maintains that the pleadings, answers to interrogatories, depositions, affidavit, and other record evidence conclusively demonstrates as a matter of law that Yamaha's actions and/or omissions relating to the subject incident do not rise to the level of egregious misconduct required to sustain a claim for punitive damages. As such, Yamaha moves to dismiss Plaintiff's punitive damages claims.

### FACTUAL STATEMENT

On July 29, 2018, an explosion and fire occurred on a 2014 Sea Fox Commander (the "vessel") owned by Defendant, Daniel Henderson.[1] At the time of the explosion, Plaintiffs Hugo Gonzales, Jeremy Eades and Galloway Outlaw-Knight[2] were changing out the vessel's batteries.[3] Plaintiffs were injured; Mr. Eades has since died from mixed drug intoxication.[4]

---

[1] Plaintiff's exhibit A.
[2] Each of these Plaintiffs have filed separate lawsuits (2-19-131 and 2-19-132).
[3] Defendant's exhibit I. Hugo Gonzalez deposition, pp. 158-160.
[4] Id. pp. 172-173.

The vessel was equipped with two 2013 Yamaha F150XA engines and two 2015 Yamaha MAR-FUELF-IL-TR 10-Micron Water/Fuel Separating Filters 90GPH (the "filter(s)"). The filters were designed to filter particulate matter and water out of the fuel before it reached the engines.[5] Defendant, Sea Fox Company, Inc. ("Sea Fox") designed and manufactured the vessel; the design included the placement of the water/fuel separators.[6]

Yamaha[7] asserts that the filters were designed, manufactured and tested by Dometic Corporation/Sierra International, Inc. ("Sierra") and the Engines were manufactured by Yamaha Motor Corporation.[8] Plaintiffs dispute who designed and manufactured the engines and filters.

Since 2005, Yamaha has administered and continues to administer warranty claims and customer complaints involving and/or arising out of the use of Yamaha products, including, but not limited to the filters and engines.

The engines were shipped to Yamaha, on October 2, 2013, who in turn sold them to Sea Fox on November 26, 2013.[9] Sea Fox sold the vessel, equipped with the engines to Paradise Marine Center ("Paradise"),[10] who sold the vessel to Daniel Henderson on or

---

[5] Id.; Plaintiff's exhibit B, D.Kerr Expert Report, p. 9.
[6] Plaintiffs' exhibit C, Sea Fox's Certificate of Origin; Plaintiffs' exhibit D, Yamaha Pre-Delivery Inspection Sheet.
[7] Yamaha is the North American distributor of Yamaha-branded products and, as such was in the chain of distribution of the engines and filters. Defendant's exhibit H.
[8] Yamaha Motor Corporation is not a party to this lawsuit; Defendant's exhibit F, James Mills Depo., p. 19; Defendant's exhibit G, Certificates of Origin for Subject Engines.
[9] Defendant's exhibits J and k.
[10] Defendant's exhibit L.

about November 29, 2013.[11] Mr. Henderson took possession of the vessel on February 25, 2014.[12]

On three (3) separate occasions, Mr. Henderson returned the vessel to Paradise for warranty work.[13] On December 7, 2017, the vessel was taken to Olmstead Shipyard to repair damage to its hull and engines.[14] In either May or June 2018, Olmstead completed repairs to the damaged engines and hull.[15] The vessel remained at Olmstead until a few days prior to the incident (*i.e.,* approximately 3 to 4 months).[16]

Yamaha contracted with Sierra to design and manufacture water/fuel filters and estimates from 2011 to 2020. Yamaha sold approximately 2,386,460 filters.[17] Yamaha asserts that it has received a total of 48 warranty claims related to leaking and/or corrosion with the filters;[18] Plaintiffs aver that Yamaha has not produced all related warranty claims. None of the 48 warranty claims involved a claim of personal injury, death or damage to property from fire or an explosion, nor has the subject filter been the subject of a complaint for personal injury or wrongful death.[19]

The subject filter was manufactured on December 25, 2015,[20] and Mr. Henderson believes he installed the filters on the vessel in March or April 2017.[21]

---

[11] Defendant's exhibit D.
[12] Id.
[13] Defendant's exhibit M.
[14] Defendant's exhibit N.
[15] Defendant's exhibit O.
[16] Defendant's exhibit P.
[17] Defendant's exhibit F, Mills depo. pp. 17-19; Defendant's exhibit Q.
[18] Defendant's exhibit R.
[19] Id.; Defendant's exhibit H.
[20] Defendant's exhibit F, Mills depo. p. 90.
[21] Defendant's exhibit W, Henderson depo. p. 125.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material

fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## **LAW AND ANALYSIS**

Plaintiffs filed this lawsuit against Yamaha and other Defendants claiming, among other things, that: (1) the filters are defective in design and/or manufacture; and (2) that Yamaha is liable for negligence for failure to warn or, alternatively, failing to properly warn consumers, including Plaintiffs of the alleged defects. Specifically, Plaintiffs allege that the filters are defective in that: (1) the cannister that contains the filtering device is manufactured using materials that, over time, will rust or corrode when submerged in water; (2) the filters are located in an area of the vessel that allows them to be submerged in water; (3) the end users are not warned that there is a risk that fuel and fuel vapors can be released in the event that the cannisters rust to the point where their integrity is compromised.

Plaintiffs allege that Yamaha's misconduct of failing to test for corrosion prior to the sale of the product was willful, grossly negligent, and highly reckless, considering the potential for fuel leakage and given the absence of detailed information regarding the coating that was intended to prevent corrosion. Plaintiffs further allege that Yamaha's conduct was willful, or grossly negligent, and highly reckless because it failed to perform an initial design failure modes and affects analysis on the filter to identify potential failures for the filter, and how to design out such failures. Specifically, Plaintiffs assert that Yamaha knew that if the filter were to rust, it would corrode and leak fuel, and it also knew the filter would be mounted in the bilge area. Plaintiffs also maintain that the two warnings placed

on the box that contained the filter, and the filter itself failed to warn of the effects of corrosion and/or rust.

Plaintiffs argue that there is a genuine issue of material fact for trial as to whether Yamaha acted with callous disregard when it removed its original requirement that the filter undergo corrosion testing despite knowing that it would be mounted inside the hull of boats in the bilge area, and that if the filter did rust and corrode, it would leak fuel into the hull. Plaintiffs argue that there is a genuine issue of material fact for trial as to whether Yamaha's knowledge of corrosion in the filters, through its warranty claim system, and its failure to make any subsequent changes to the filter, constitutes gross negligence or reckless conduct.

In addition, Plaintiffs assert that Yamaha's claim of a six-month replacement schedule may be relevant because that schedule was not based on corrosion factors or concerns. Finally, Plaintiffs argue that there is a genuine issue of material fact for trial as to whether or not Yamaha failed to properly warn of the danger of corrosion on either the packaging or the filter itself.

Plaintiffs' claims for punitive damages arise under general maritime law. *In re Crosby Marine Transportation, L.L.C.,* 2021 WL 1931168 (E.D. La. 5/13/2021). Under general maritime law, punitive damages may be available if the plaintiff proves that the defendant's "behavior … is more than merely negligent," but rather was so egregious as to constitute gross negligence, reckless or callous disregard for the rights of others, or actual malice or criminal indifference. *Maritrans Operating Partners v. Diana T,* 1999 WL 144458, at *7 (E.D. La. 3/15/1999) (citing *In re Marine Sulphur Queen,* 460 F.2d 89, 105

(2d Cir. 1972)). "The theory of a punitive damage award is that the defendant has committed the civil equivalent of a crime." 1 THOMAS J. SCHOENBAUM, ADMIRALITY AND MARITIME LAW § 5:10 (6th ed. 2020). "Punitive damages are awarded both to punish the particular defendant and to deter similar conduct by others." *Id.* "Punitive damages are limited to cases of 'enormity,' that is, where a defendant's conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for others' rights, or even more deplorable conduct. *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 492 (2008).

Yamaha argues that the record evidence falls short of the requisite degree of wanton misconduct to rise to the civil equivalent of a crime. Yamaha asserts that it did not engage in anything that was even remotely akin to the level of egregious misconduct required to support an award of punitive damages.

Specifically, Yamaha asserts that the record is devoid of evidence that its acts and/or omissions "amounted to the civil equivalent of a crime" or rose to the level of "reprehensible culpability" involved in *Exxon Shipping* (conduct warranting punitive damages included Exxon's failure to monitor its captain once he returned to duty after dropping out of the prescribed course of treatment for his alcoholism and backsliding into his former drinking habits, all of which was known to Exxon; the captain's inexplicable abandonment of his post on the bridge of the 900-foot oil tanker two minutes before a critical turn to avoid a reef, even though he was the only person onboard the ship licensed to navigate this part of the Prince William Sound, and the captain's excessive blood-alcohol

level in the wake of the grounding and 11 million gallon oil spill.) *Exxon Shipping*, 554 U.S. at 476-80.

Yamaha argues that the record evidence that exists establishes that out of more than 1,830,513, filters sold between 2005 and 2020, Yamaha only received 48 warranty claims related to rust or corrosion and of those 48 claims, either 2 or 4 relate to reports of corrosion that allegedly resulted in a leak. None of the claims involved a claim of personal injury or death.

Yamaha relies on *In re Crosby Marine Transp.,* 2021 WL 1931168 at *5, to support its position that punitive damages are not warranted in this case. That case involved a nighttime collision between a 22-foot power boat being powered by plaintiff while intoxicated, and a barge and island pushboat (collectively referred to as the "barge"). The operator of the barge left it protruding into and blocking 35% of Bayou Segnette; the barge was devoid of red and green navigational lights and/or white all-around lights. The impact killed one of three passengers and seriously injured plaintiff and the other two. The deceased's estate filed a wrongful death and survival action which included punitive damages.

Defendant filed for summary judgment concerning the punitive damages claim which the court granted finding that Defendants alleged act and/or omissions did not rise to the level of egregiousness required to sustain such an award. The court noted that even if accepted as true plaintiff's evidentiary proffer (*i.e.,* that the defendants had violated well-established navigation rules relating to the vessel lighting, as well as their own accident prevention plan and safety rules), there was no evidence that their actions rose to the civil

equivalent of a crime or the kind of reprehensible culpability involved in *Exxon*. Specifically, the court noted that there was no evidence that the defendants had earlier near-miss encounters with other boats in Bayou Segnette or were previously warned of the possibility of the exact type of collision that occurred, which would have placed Defendant on notice of the risks of their actions, nor was there evidence that they engaged in a pattern of such violations as would demonstrate a callous disregard for others' rights.

The *Crosby* court stated that:

> to hold out the prospect of punitive damages in a case such as this would risk transforming every garden-variety general-maritime-law negligence case involving a vessel collision into a punitive damages case. *Exxon shipping* is not nearly so broad.

*Id.* at p. 5.

Here, the evidence establishes that of the more than 1,830,513, filters sold between 2005 and 2020, Yamaha received 48 warranty claims related to leaking or corrosion. Of those claims, either 2 or 4 related to reports of leakage that allegedly were the result of rust and/or corrosion. None of the complaints involved a claim for personal injury or death.

Yamaha further maintains that it cannot not be held liable for punitive damages due to the conduct of a non-party—Sierra, who Yamaha asserts actually designed, tested, and manufactured the filters.

Plaintiffs assert that Yamaha played a more significant role in the specification and creation of the filter, including: (1) providing Sierra an initial draft of and the final specifications sheet for the filter; (2) mandating to Sierra what safety and regulatory testing was required and compelling Sierra to provide an affidavit stating that such testing had

been done and the filter had passed;[22] (3) performing a Quality Audit of the filter Manufacturer in Taiwan;[23] (4) providing Quality Assurance Guidebook for use by Sierra the selected manufacturer;[24] (5) communicating directly with the test facilities regarding test results;[25] (6) reviewing and providing feedback on testing;[26] (7) Yamaha required that "all parts and packaging of filters, heads and kits" be documented on drawings approved by Yamaha, and no changes made without Yamaha approval;[27] (8)Yamaha met with Sierra concerning the creation of the filter;[28] and (9) retained approval for changes to the filters once it was in production.[29]

Plaintiffs submit evidence that Yamaha removed the corrosion testing requirement from the final set of specifications.[30] Plaintiffs asserts that Yamaha first required corrosion testing, and then removed it, knowing that the filter would be mounted inside the hull of boats, in the bilge area, and that if it did rust and corrode, it could leak fuel into the hull. Plaintiffs argue that they are entitled to punitive damages because Yamaha knew that no corrosion testing was being performed on the filter, and the filter failed to have sufficient corrosion protection applied to the outside of the filter. Specifically, Plaintiffs complain that the outside of the filter is coated with a basic alkyd paint, instead of a coating/paint

---

[22] Plaintiff's exhibit 1, James Mills deposition, p.47.
[23] Plaintiff's exhibit 2.
[24] Id.
[25] Plaintiff's exhibit 3.
[26] Id.
[27] Plaintiff's exhibit 4.
[28] Id.
[29] Plaintiff's exhibit 5.
[30] Plaintiff's exhibits 8 and 9.

with an epoxy component, and there is no requirement as to thickness of the outer coating. Plaintiffs maintain that this is evidence of Yamaha's disregard for danger.

To buttress its position, Plaintiffs submit evidence by Yamaha's experts who initiated saltwater spray testing on identical exemplar filters. The testing revealed that filters exposed to the nominal equivalent of 11 months exposure to a saltwater environment, showed signs of gross corrosion. Plaintiffs' experts advise that all of the filters, including the 6-month filters exhibited signs of metal degradation. Plaintiffs also note that the filters contain no warning of rust or corrosion.

Plaintiffs rely on *Moreaux v. Clear Blue Ins. Co.,* 2021 WL 855282 (W.D. La. 3/5/2021), however that case involved punitive damages pursuant to Louisiana Civil Code article 2315.4 which allowed such damages when a defendant's intoxication caused the injury. Also, the motion for summary judgment was denied due to a spoliation issue in the case. Plaintiffs also rely on *Bland v. Omega Protein, Inc.,* 2016 WL 280403 (W.D. La. 1/21/2016) which involved an employer denying maintenance and cure benefits. In that case, there was extensive controversy in the medical opinions. In *Barclay v. Cameron Charter Boats, Inc.,* 2011 WL 3468380 (W.D. La. 2011), the court denied summary judgment to dismiss plaintiff's punitive damages claims because there were conflicting medical reports.

Plaintiffs also rely on *Ainsworth v. Caillou Island Towing Co., Inc.,* 2013 WL 6044376 (E.D.La. 2013) wherein the court denied summary judgment because there was a genuine issue of material fact regarding whether defendant properly trained its employees,

formulated the appropriate policies, and enforced those policies, or whether it engaged in callous or reckless disregard to the creation of unseaworthy conditions.

Plaintiffs also point the Court to Pattern Jury Instruction § 4.9 for the Fifth Circuit. Under general maritime law, punitive damages may be awarded "against a defendant if that defendant has acted willfully and wantonly." The Pattern Jury Instruction further states:

> A defendant's action is willful or wanton if it is in reckless or callous disregard of, or with indifference to, the rights of the plaintiff. An actor is indifferent to the rights of another, regardless of the actor's state of mind, when [he/she/it] proceeds in disregard of a high and excessive degree of danger that is known to [him/her/it] or was apparent to a reasonable person in [his/her/its] position.

The United States Supreme Court in *Exxon Shipping,* 554 U.S. at 493-94, identified "two different types of conduct" that can constitute recklessness: (1) the actor knows, or has reason to know of facts which create a high degree or risk of harm to another, and deliberately proceeds to act, or fail to act, in conscious disregard of, or indifference to, that risk, or (2) the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. (quoting Restatement (Second) of Torts § 500 cmt. A (1965)).

Plaintiffs assert that Yamaha was putting into commerce a small metal container it knew would be inside a vessel's bilge area, a "highly corrosive" area and Yamaha knew its product had not been corrosion tested. Plaintiffs argue that the jury should consider the magnitude of foreseeable risk (Yamaha's filter leaking fuel into boats) compared to the "burden of precaution" (Yamaha increasing the protective coating on the filter).

Yamaha remarks that its 30(b)(6) corporate representative, Alex Holtschulte[31] has testified at his deposition that he had been told by a Mr. Terry Chang at Auto World, and Mr. Reick at Sierra, that even though Sierra could not locate any reports, the vendor (Joy Time) who manufactured the filters, and Sierra, the engineer who oversaw the design, development, manufacture, and testing believed corrosion testing was performed prior to their production.[32] As noted by Plaintiffs this testimony is inadmissible hearsay. However, despite Yamaha's corporate representative who testified that there was no testing for rust or corrosion performed on the filters,[33] Yamaha has provided summary judgment evidence that Autoworld Parts performed salt spray testing on the 10 micron filters in 2005 in compliance with industry standards and the filters passed those tests.[34]

Plaintiffs argue that "any suggestion that corrosion testing was done in 2005" is ridiculousness considering that it was not even called for in the final specifications on the filter.[35] "For such testing to have been done in 2005, we have to believe that Sierra Terry Chang, on their own, went beyond the specifications Yamaha had provided and decided to subject the filter to corrosion testing, and then apparently withheld such test results from Yamaha which had no knowledge of such testing.  This is even through Holtschulte testified that Sierra would not in fact have done any testing without Yamaha's knowledge. Holtschulte Dep. At pp. 95-96 and 98-99.[36]

---

[31] Defendant's exhibits 20-22.  Holtschulte deposition.
[32] Id. pp. 41, 97, 100, 102, 103 and 140.
[33] Plaintiff's exhibit 2, James Mills deposition, p. 48:12-16.
[34] Defendant's exhibit B, attached to Sur-reply, Auto World Salt Spray Test Results, dated September 2005, Doc. 217.
[35] Plaintiff's sur-reply to its opposition to motion for summary judgment, p. 2., fn. 5, Doc. 198.
[36] Id.

Yamaha relies on the following record evidence:

- Yamaha did not design and/or manufacture the subject filter, but was designed by various entities who Plaintiffs have not sued; Plaintiffs dispute this and have submitted summary judgment evidence to establish that Yamaha was very involved in the design of the filter;

- The filter met or exceeded all applicable industry standards at the time it was sold;[37]

- The filter included on-product warnings and instructions which advised users to "replace the subject filter every 50 hours or 6 months, whichever comes first", and to "check for leaks after installation and after every engine start up;"[38]

- Plaintiffs' experts agree that the filter had been installed in the vessel for between 13 and 27 months;

- Plaintiffs' principal liability expert further agrees that the incident likely would not have happened had the vessel owner timely complied with the on-product instructions;[39]

- Between 2011 and 2020, Yamaha sold an estimated 2.4 million filters and received 48 warranty claims related to leaking and/or corrosion;

---

[37] Defendant's exhibit B, attached to Sur-reply, Doc. 217.
[38] Defendant's exhibit A, Deposition of Anand Kasbekar.
[39] Id., p. 91:8-25. The Court has reviewed p. 91 of Mr. Kasbekar (Doc. 221 p. 2 of 6, Page ID#: 2803), and Mr. Kashbekar does not testify to what Yamaha claims. Mr. Kashbekar testified that "27 months is more than four times the six-month" recommended replacement interval or "instruction on the label." He further testified that on the date of incident the filter was leaking.

- At least 8 of the 48 claims related to leaks resulting from a damaged or twisted gasket during installation of the filter;

- Only 4 of the 48 claims related to reports of corrosion, and of those 4, only 3 involved corrosion that allegedly resulted in a leak;

- Plaintiffs' expert identified 9 claims over a 10 year period that reported some degree of corrosion/rusting of the water/fuel separator—only 3 of which resulted in leaks;

- Plaintiffs' expert agrees that these warranty claims did not place Yamaha on notice that these fuel water separators have any rust or corrosion defect or problem.[40]

- None of the warranty claims involved a claim of personal injury, death, or damage to property from fire or an explosion.

Yamaha argues that this evidence falls short of proof that Yamaha acted with "a conscious disregard for, or indifference to, the safety of its customers," let alone that it exhibited the level of egregious misconduct bordering on criminality that applies to claims arising under and governed by federal maritime law, as established in *Exxon Shipping, supra.*

Plaintiffs rely on testing performed by one of Yamaha's experts on the subject filter. The filter showed corrosion on the bottom and rust that had eaten away at the metal

---

[40] Defendant's exhibit A, Kasbekar depo., pp. 252:20-25-253:1-2. The Court has reviewed the excerpt deposition testimony of Kasbekar, provided by Defendant and do not find that Plaintiffs' expert agreed that the warranty claims did not place Yamaha on Notice that these fuel water separators have any rust or corrosion defect or problem.

cannister after being placed in a 25 foot Sea Fox boat for a six month period.[41] Plaintiffs urge the Court to consider that Yamaha's specifications for its filter did not call for any corrosion testing or any specific standard regarding corrosion, and yet Yamaha knew it was getting warranty claims of its filters corroding and leaking fuel. In addition, Plaintiffs assert that Yamaha's claim that it did not design the filter is false considering that all specifications sheets for the filter came solely from Yamaha, and Yamaha removed the corrosion testing requirement from the final set of specifications.[42]

Finally, Plaintiffs assert that the warnings to change out the filter related solely to performance but failed to warn of the effects of corrosion or rust.[43] Plaintiffs also note that Yamaha's corporate representative testified that no testing was performed to mandate that the filter be replaced every 50 hours, or withing a six-month time period, but the replacement interval was aligned with other recommendations for service on the outboard motor.[44]

A punitive damage claim under maritime law has historically been held to be highly fact intensive. See, e.g., *In re Complaint of Merry shipping, Inc.,* 650 F.2d 622, 625 (5th Cir. 1981); *Williams v. State through Dept. of Wildlife and Fisheries,* 684 So.2d 1018, (La. App. 1 Cir. 11/20/96). The Court finds that there are genuine issues of material fact for trial as to Yamaha's involvement in the design of the filter, whether or not testing for corrosion and/or rust was performed, and whether or not the two different warnings between the filter

---

[41] Exhibit 1, pp. 72-73, attached to James Mills Rule 30(b)(6) deposition.
[42] Sierra Depo. pp. 37, 40, 42; Plaintiffs' exhibit 9.
[43] Mills Depo. pp. 55, 98-99.
[44] Id.

and the box in which the filter was contained, properly warned consumers of the danger of rust or corrosion.

## CONCLUSION

For the reasons set forth above, the Motion for Partial Summary Judgment will be denied.

**THUS DONE AND SIGNED** in Chambers this 28th day of January, 2022.

_____
JAMES D. CAIN, JR.
**UNITED STATES DISTRICT JUDGE**