UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **HUGO GONZALEZ** | **CASE NO. 2:19-CV-00130 LEAD** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **SEA FOX BOAT CO INC** | **MAGISTRATE JUDGE KAY** |

### MEMORANDUM ORDER

Before the court is a Motion in Limine [doc. 286, 293] filed by plaintiffs and seeking to limit or strike the expert report and testimony of defense expert witness Gary Fowler under the standards set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendant Yamaha Motor Corporation USA ("Yamaha") opposes the motion. Doc. 336.

### I.
#### BACKGROUND

This suit arises from a maritime accident that occurred on or about July 29, 2018, on a 2014 Sea Fox Commander vessel, while plaintiffs Jeremy Eades, Hugo Gonzales, and Galloway Outlaw-Knight were changing out the vessel's batteries. All three were seriously injured in the explosion and resulting fire, and Eades has since died of mixed drug intoxication. Plaintiffs have attributed the explosion to a leaking fuel water separator filter, causing the presence of gasoline vapors on the vessel, and filed suits against Yamaha, as designer of the filter, and Sea Fox Boat Company, Inc. ("Sea Fox"), as

designer/manufacturer of the vessel. Doc. 1. The matter is now set for jury trial before the undersigned on May 16, 2022.

Plaintiffs attribute the accident to a leak in the starboard fuel/water separator filter. Yamaha has given notice of its intent to introduce testimony from materials and metallurgical engineer failure analyst Gary Fowler as a liability expert. Plaintiffs move to exclude Fowler's opinions and anticipated testimony on the results of Fourier Transform Infrared Spectroscopy ("FTIR") testing and sea spray testing on the grounds that these tests were unreliable and any opinions flowing from them will not assist the jury.[1] Docs. 286, 293. Yamaha opposes the motion, arguing that Fowler properly relied on the work of other chemists for both tests. Doc. 334.

## II.
## LAW & APPLICATION

### A. Governing Law

The trial court serves as gatekeeper in determining the admissibility of expert testimony, by making an initial determination of whether the expert's opinion is relevant and reliable. *See Daubert*, 509 U.S. at 589. This gatekeeping function extends to all expert testimony, whether scientific or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Accordingly, Federal Rule of Evidence 702 provides that the court must consider the following three requirements on challenges to experts: 1) qualifications of the expert witness; 2) relevance of the proposed testimony; and 3) reliability of the principles

---

[1] Plaintiffs also move to exclude Fowler's opinions to the extent he relies on the work of defense expert Kevin Breen, who is the subject of a separate *Daubert* motion. Because the court has denied the *Daubert* challenge to Breen by separate order, it regards this request as moot.

and methodology on which the testimony is based.[2] The proponent of the expert testimony bears the burden of proving its admissibility, by a preponderance of the evidence. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

The trial court has broad latitude in determining the admissibility of expert testimony. *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Rejection of expert testimony is the exception rather than the rule, and the court's role as gatekeeper "does not replace the traditional adversary system and the place of the jury within the system." *Johnson v. Samsung Electronics Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011); *Scordill v. Louisville Ladder Grp., LLC*, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Scordill*, 2003 WL 22427981 at *3 (quoting *Daubert*, 509 U.S. at 596).

### B. Application

In his report Fowler stated in relevant part:

> *Fourier Transform Infrared Spectroscopy (FTIR)*
> Samples of the paint from the starboard, port and exemplar filters were removed and analyzed at ATS using FTIR. All three paint samples had the same spectrum. The major component of the paints is alkyd enamel.
> The filter element and pads between the spring and can from the starboard, port and exemplar filters were analyzed using FTIR. The pads are polyester with an acrylic adhesive. The major components of filter elements

---

[2] The *Daubert* Court identified several additional factors for assessing whether the expert's methodology is valid and reliable, including whether the expert's theory had been tested and subjected to peer review, the known or potential error rate for the expert's theory or technique, the existence and maintenance of standards and controls, and the degree to which the technique or theory has been generally accepted in the scientific community. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). However, the same standards cannot be applied to all possible fields of expertise. Accordingly, the *Daubert* analysis is necessarily flexible and fact-specific. *Kumho*, 526 U.S. at 150.

> from the three filters were polyester and styrenated acrylic. The pads and filter elements from the three filters were similar to each other.

Doc. 334, att. 3, p. 9. He then went on to describe in greater detail a salt spray test, in which "[e]leven new exemplar marine filters were tested in a salt spray chamber for 30 days (720 hours) at Atlas Testing Laboratories, Inc. per ASTM B117-19, Standard Practice for Operating Salt Spray (FOG) Apparatus (JIS equivalent is JIS Z 2371)." *Id.* at 9–11. At the conclusion he noted that all of the filter cans and heads exhibited superficial signs of corrosion, including small areas of superficial rust and paint deterioration on the Yamaha filter, but determined that "[t]he superficial corrosion on the filters would not have affected the integrity of the can." *Id.* at 10.

Plaintiffs argue that Fowler's opinions derived from the testing are unreliable because he did not personally conduct it and could not answer certain questions about it during his deposition.[3] Namely, they point to his admission that he was qualified to read comparative graphs of the FTIR results "but you really need a chemist to look at the smaller peaks" as well as his inability to explain what certain notes made by the chemist who conducted the test and how the raw data was listed in the results. Doc. 286, att. 5, pp. 14–18. As Yamaha points out, however, plaintiffs' corresponding metallurgical expert Tom Ackerson relied on a chemist to conduct FTIR testing for plaintiffs and that individual has not been designated as a witness. Ackerson also referred questions on the technical details of the test results to that chemist, and offered no criticism of Fowler's report when offered

---

[3] Plaintiffs also point out that Fowler could not identify the chemist who conducted the test or recall his precise credentials at the time of his deposition. Doc. 286, att. 5, pp. 10–11. However, Fowler retrieved the chemist's name (Dr. Shabeer) during a break. *Id.* at 13. Yamaha provided the CV of Dr. Shabeer in its opposition to this motion [doc. 334, att. 6] and plaintiffs have made no challenge to his qualifications.

the opportunity to do so. Doc. 334, att. 1. Additionally, as Yamaha points out, the only relevance of the FTIR testing is to prove the now-undisputed fact that the Yamaha filters were manufactured with an alkyd-based, rather than epoxy-based, coating. That fact is now undisputed. Accordingly, even if these challenges showed that Fowler's reliance on the FTIR testing conducted by another chemist was unreliable, it would not provide a basis for excluding his testimony at trial.

As for the salt spray testing, plaintiffs again challenge Fowler for his failure to conduct the test personally or answer certain questions about it. In this case, the questions relate to which company actually applied the paint to the filters and whether the chemist who conducted the test had personally visited the site in between dropping the filters off and picking them up at the beginning and end of the 720 hours. Doc. 286, att. 5. Fowler also agreed that salt spray testing's ability to imitate real world conditions depended on how the boat owner treated his vessel, but asserted that in this case they were able to extrapolate from the testing based on field data. *Id.* Finally, plaintiffs argue that it is unfairly prejudicial to allow Fowler to testify as to the test results since they involve comparisons to filters manufactured by non-parties.

As above, plaintiff expert Ackerson offered no criticism of this testing when offered the opportunity to do so. Doc. 334, att. 1. Again, these challenges do not show that Fowler erred in his use of the salt spray testing. Moreover, the performance of the Yamaha filter in comparison to that of others on the market is relevant to the question of whether the filter was defective in its design. Even without the comparison, the test is highly relevant and helpful to the factfinder for its demonstration (according to Fowler) that the Yamaha filter

experienced only superficial deterioration not likely to impact the structure of the canister. Any questions relating to his supervision of the experiment or failure to replicate conditions in the subject vessel are instead fodder for cross-examination.

### III.
### CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the Motion in Limine [doc. 286, 293] be **DENIED**.

**THUS DONE AND SIGNED** in Chambers this 6th day of May, 2022.

_____
JAMES D. CAIN, JR.
UNITED STATES DISTRICT JUDGE